IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER GARDOM,

        Plaintiff,

v.                                            CIV 03-699 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

        Plaintiff Christopher Gardom suffered severe injuries in an automobile accident in August 2000, when he was nineteen years old. He applied for benefits two months later in October 2000. His claim was denied initially and on reconsideration. *See id.* at 82-83. Following a hearing, Administrative Law Judge ("ALJ") Gary L. Vanderhoof found that, although Plaintiff had certain limitations, he was not disabled at Step 5 based on the testimony of a vocational expert. *See id.* at 19-21. The Appeals Council declined review on April 7, 2003, thereby rendering the ALJ's decision final. *Id.* at 405.

        This matter is before the Court on Plaintiff's Motion to Reverse or Remand, where the only claim concerns whether the ALJ included all of Plaintiff's limitations in his residual functional capacity assessment. *See Docs. 11, 12.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.

        If substantial evidence supports the ALJ's findings and the correct legal standards were

applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence ***nor substitute my judgment for that of the agency.*** *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991) (emphasis added). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

I have carefully considered the arguments of the parties and the portions of the record that they cite in support of those arguments. Although I do not disagree with the ALJ's ultimate conclusion, I am faced with the regrettable position of having to remand the matter to the Commissioner for further proceedings. From the way the ALJ's opinion is written, I cannot determine whether he considered and rejected the omitted limitations or if instead he overlooked them altogether in framing his hypothetical questions to the vocational expert.

For example, the ALJ recounted that Plaintiff testified he has double vision, problems with depth perception, a blind spot and blurriness. *See Record* at 17. The ALJ observed, however, that despite his complaints of decreased visual acuity, Plaintiff drives to his college classes and engaged in previous work even with the visual limitations. Ultimately, the ALJ was not convinced that Plaintiff's testimony about his limitations was entirely credible. *Id.* at 16 ("The Claimant's testimony was, for the most part, credible but did not comport with the objective medical evidence of record."). In what appears to be a contradiction, however, the ALJ's opinion

specifically found that the "medical evidence of record . . . ***documents*** the problems in respect to visual acuity and difficulties with balance." *Id.* at 17 (emphasis added).

The ALJ's opinion does not define what he means by the phrase "visual acuity" or specifically discuss any of the medical records pertaining to Plaintiff's vision. Rather, the opinion refers only to Plaintiff's testimony regarding the alleged vision limitations. *See Doc. 12* at 6 (and, as cited therein, *Record* at 38-40, 45, 56); *Record* at 17 (testimony that these problems affect Plaintiff's abilities to snowboard, skateboard, ride a bike and read).

Here, Plaintiff asserts that the medical records establish that he has several specific limitations: "limited vision, double vision, loss of depth perception,[1] loss of accommodation,[2] loss of field of vision, and has been advised not to drive." *Doc. 12* at 6 (citing *Record* at 161, 184, 195, 208, 248). That is a fair construction of the records. When he was discharged from physical therapy at St. Joseph Healthcare in December 2000, Plaintiff was reporting "blurred and double vision in the right eye," which the counselor reported "may be interfering with the patient's fine motor abilities." *Id.* at 161. The occupational therapist also reported that

> After instruction in application of eye exercises, combined with electromyogram biofeedback, the patient is almost able to fully open his right eyelid. He has decreased oculomotor tracking abilities in the right eyeball, specifically up and down motions. The patient was instructed in oculomotor exercises to be included in the home exercise program. Processing reaction time has improved and the patient is now able to react more quickly when objects are coming toward him. The patient was given a pre-driver's screening

---

[1] "Binocular vision: The ability to maintain visual focus on an object with both eyes, creating a single visual image. Lack of binocular vision is normal in infants. Adults without binocular vision experience distortions in depth perception and visual measurement of distance." www.medterms.com.

[2] "Accommodation: In medicine, the ability of the eye to change its focus from distant to near objects (and vice versa). This process is achieved by the lens changing its shape." www.medterms.com.

>evaluation and scored within normal limits on both the simple and complex reaction time subtest, as well as glare recover and night vision tests.

*Id.* at 161 (emphasis added).  Plaintiff thus had partially met the short term goal of "scoring within normal limits for his age" on a driver's evaluation regarding such things as appropriate reaction time.  However, he did not meet that goal for "visual acuity," *id.*, and, therefore, driving was "only recommended when the patient's vision has returned to an acceptable level as determined by Dept. of Motor Vehicles."  *Id.* at 162.

Moreover, a subsequent "eligibility determination" form for the New Mexico Division of Vocational Rehabilitation dated January 5, 2001 provides that one of Plaintiff's  "impediments" to employment is "Limited Vision."  *Id.* at 184.  A subsequent visit to Dr. Thomas J. Carlow of the "Eye Associates of New Mexico," states Plaintiff "still has double vision if he does not look at someone straight on" and diagnosed Plaintiff with "a right homonymous hemianopia[3] and a persistent right third nerve paresis with aberrant reinnervation."  *Id.* at 195.  Dr. Carlow therefore

---

[3]  Homonymous Hemianopia

>This is a condition sometimes found after a stroke or some injury to the brain. It is not a condition affecting the eye.  Hemianopia relates to the brain's impaired ability to receive the information transmitted to it through both eyes. The person experiencing it has difficulty seeing one side of their surrounding environment, or will report that one side appears different from the other.
>
>Hemianopia may be complete or partial.  In the case of complete, the person affected can only see to one side when looking straight ahead. With partial hemianopia, objects appear different in clarity or brightness.  Other effects include double vision and difficulty interpreting visual information (especially if the view is complex or involves many moving people).  Sometimes, the visual image may completely disappear or distort.

www.rsb.org.au/eye.htm#Homonymous.

was of the opinion that Plaintiff should not be driving. *Id.* Therefore, on a prescription pad Dr. Carlow indicated that "Christopher should not drive – He has a visual field defect and double vision." *Id.* at 208.

Based on these records, Dr. David Green, the agency physician who completed the physical residual functional capacity form in May 2001, determined that Plaintiff has no limitations in "near acuity" or "far acuity" or "color vision." However, Dr. Green noted physical limitations as to "depth perception," "accommodation," "field of vision" and "balance." He further speculated that the visual conditions "may improve with time." *Id.* at 247-48. The ALJ specifically indicated that he based his findings on Dr. Green's form. *Id.* at 18.

The Commissioner asserts that medical records show improvement in Plaintiff's double vision such that it does not occur when he keeps his eyes straight, and that Plaintiff engages in a full range of "daily activities including driving, cleaning the house, attending school, doing homework, playing with animals, working on his car, chopping wood with an ax and fixing things around the house." *See Doc. 13* at 6. Thus, the Commissioner argues that the ALJ eliminated these other vision restrictions from his hypothetical to the vocational expert because those conditions are not supported by the record. The problem, however, is that the ALJ's opinion expressly says that the ***he did credit*** all of those restrictions. Therefore, the ALJ was required to address them with the vocational expert.[4]

---

[4] At the hearing, the ALJ asked the vocational expert to assume a driving restriction, and limitations in the ability to balance, *Record* at 72, and "**no work which would require fine detailed perception, vision**. His OD was 20/40 plus two and OS 20/20. And the near vision, far vision, colored vision would be unlimited," *id.* at 74 (emphasis added). The vocational expert testified that with those restrictions Plaintiff could perform all of the jobs she identified. *See id.* at 73-74. If by "no fine detail" work the ALJ did in fact mean to convey "depth perception," "accommodation," "field of vision," "double vision," or "blurriness," that is by no means clear.

5

Similarly, there are problems with the ALJ's opinion regarding Plaintiff's asserted limitations in dealing with coworkers and supervisors and those issues should also be addressed on remand.[5]  As any emotional limitations, the ALJ recited much of the report by consulting clinical psychologist Dr. Annette Brooks in reaching the conclusion that Plaintiff "suffers with some emotional difficulties that would make it somewhat difficult to engage in work involving being around people." *Id.* at 17; *see also id.* at 18.

Dr. Brooks had evaluated Plaintiff in March 2001 on the very day that he had been fired from his job as an auto mechanic because he forgot to put oil in an engine and was accused of leaving an oil filter loose in another. *Id.* at 187.  Nevertheless, Dr. Brooks found that Plaintiff performed "average to superior when compared to others his age" on intellectual, memory and other such tests.  *Id.* at 188.  Dr. Brooks observed that

> Mr. Gardom is ***articulate and verbal.***  Mr. Gardom ***interacts well*** with examiner and medical staff and was well-liked.  Presentation is consistent with ***depression that has been partially controlled by medication.***  Explosive outbursts beginning in February 2001 also impact social functioning, primarily with his family at this time.  In short, while Mr. Gardom demonstrates some ***mild deficits*** in

---

[5] The ALJ noted that Plaintiff "believes that he is not able to work due to poor memory and an inability to deal with his supervisors and customers." *Id.* at 17.  Indeed, Plaintiff testified about the problems he encountered at the jobs he had after the accident, mentioning that he had trouble interacting with customers and his "manager, his authority." *Id.* at 48.  In context, however, Plaintiff's testimony seems to implicate self-consciousness and forgetfulness as the root of his asserted difficulties in dealing with customers and supervisors.  *See id.* at 48-49; *see also id.* at 117 (Plaintiff has problems when he goes out in public because he has "problems with the way I look now with my scars from injury").

It should be noted, however, that Plaintiff has also indicated that: he was fired after his boss accused him of stealing money; he is able to "deal with" change;  he discusses problems and "talk[s] it out" when he has a disagreement with someone; he is able to report to work on time, has good attendance, can usually keep up with his work, is able to concentrate, and has ***no problems*** with his supervisors and/or coworkers.  *Id.* at 117-18 (emphasis added).  However, the ALJ did not rely on this testimony to reject any limitations found by Dr. Gabaldon in his RFC.

>       several areas, these are ***likely to be adequately addressed with compensatory strategies, especially given Mr. Gardom's level of cognitive functioning.***  It is this writer's opinion that Mr. Gardom is at risk for developing a lifestyle focused on illness that is in disproportion to actual deficits.  His family, with the best of intentions, may be inappropriately reinforcing illness behavior, and the system may benefits with some interventions on how to shift their role in his transition back into the mainstream.

*Id.* at 189 (emphasis added).  Absent from her report is ***any*** discussion of significant emotional difficulties with supervisors or coworkers that would preclude Plaintiff from working.[6]  *Id.*

On the other hand, the ALJ noted that Agency psychologist Dr. J. Leroy Gabaldon "designated several moderate limitations of function in the area of social interaction and adaptation." *Id.* at 19.  Indeed, on his mental residual functional capacity evaluation form, Dr. Gabaldon indicated that Plaintiff is "moderately" limited in his abilities:  to work with others without being distracted; to interact appropriately with the general public; to accept instructions from and  respond appropriately to criticism from supervisors; and to get along with coworkers without distracting them or exhibiting behavioral extremes.  *Id.* at 191.  The ALJ did not go into these specific findings, however, and merely noted that the doctor "found no <u>markedly</u> limiting area of function."  *Id.* at 19 (emphasis added).

Plainly, it appears that the young claimant before me can work.  Moreover, in response to an inquiry by Plaintiff's attorney, the vocational expert indicated that the jobs she identified

---

[6] Plaintiff does not suggest that Dr. Brooks' notation of a "current" Global Assessment of Functioning ("GAF") of 58 itself supports a finding of a disability.  Rather, he asserts that the ALJ should have considered it.  *See Doc .14* at 4.  Indeed, a GAF score alone is not evidence of an impairment that seriously would interfere with a claimant's ability to do work and "is not essential to the RFC's accuracy." *Lopez v. Barnhart,* 78 Fed. Appx. 675, 678 (10th Cir. 10/16/03) (affirming that portion of the decision in CIV 02-303 LH/LCS).  However, given Dr. Gabaldon's below findings, the discussion of the GAF in combination with the other findings would be helpful to the analysis.

required only "some contact" in contrast to frequent contact with coworkers and supervisors.  *See id.* at 79.  Nonetheless, I feel constrained to remand the matter for the reasons set forth above.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 11)* is GRANTED IN PART and the matter is remanded to the Commissioner for further proceedings.  A final order will enter concurrently herewith.

                                                    *Karen B Molzen*
                                                    UNITED STATES MAGISTRATE JUDGE
                                                    Presiding by consent.